**Opinion issued May 28, 2026**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-24-00410-CR**

**NO. 01-24-00413-CR**

————————————

**AKINTAYO TAIWO AKINRINLOLA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Case Nos. 22CR4315 & 23CR0180**

---

# O P I N I O N

After a jury found appellant, Akintayo Taiwo Akinrinlola, guilty of the felony offenses of possession with the intent to deliver a controlled substance,

namely ketamine, weighing 400 grams or more,[1] and engaging in organized criminal activity,[2] the trial court assessed his punishment at twenty-five years' confinement for each offense, to run concurrently. In three issues, appellant contends that the trial court erred in denying his motion to suppress and his trial counsel provided him with ineffective assistance of counsel.

We reverse and remand.

## Background

United States Customs and Border Protection ("CBP") Officer A. Irizarry testified that his job involved inspecting international shipments to the United States for prohibited items, including controlled substances. In 2022, CBP received an inspection request from one of its "container security officers [working] in Germany," stating that there was "a package coming into the United States that was suspected of having ketamine" inside. In response, Irizarry placed "a hold" on the package with the United Parcel Service ("UPS") so that it could be inspected by CBP when it arrived in the United States.

On November 9, 2022, Officer Irizarry received the package—a regular cardboard box. The package was addressed to Lisa Pimbley, and its intended

---

[1]     *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(10), 481.112(a), (f).

[2]     *See* TEX. PENAL CODE ANN. § 71.02(a), (b).

destination was Galveston, Texas.[3]  Irizarry opened the package, and inside he found a "medicine ball" used for exercise.  (Internal quotations omitted.)  Irizarry cut open the medicine ball and found "a crystalline substance" that he tested with a "TruNarc"—"a handheld device that shoots a laser and . . . identifies [a] substance."  The TruNarc test revealed that the substance inside the medicine ball was ketamine.[4]

Former Department of Homeland Security ("DHS") Investigator R. Vera testified that he previously worked at DHS's Galveston office.  While working there, in November 2022, he received information about a package containing ketamine that had been seized, and he was tasked with investigating who was the intended recipient of the package.  According to Vera, the package was addressed to Lisa Pimbley at the Holiday Inn hotel in Galveston.

In December 2022, a date was chosen to monitor the package's destination—the Holiday Inn hotel—to see if "someone [would] attempt to pick it up."  Investigator Vera parked outside the front of the hotel "to monitor the area for anyone walking out with th[e] package."  From his position, Vera was able to

---

[3]  Officer Irizarry noted that appellant's name was not on the package.

[4]  Department of Public Safety Crime Lab forensic scientist Lauren Molina testified that she tested a white substance that was inside a "medicine ball" which was inside a cardboard box.  Her testing identified the white substance as ketamine and its weight as 4,100 grams.  Molina stated that ketamine was a controlled substance.  A copy of Molina's report was admitted into evidence during her testimony.

see people coming in and out of the front entrance of the hotel. There were other law enforcement officers parked in different locations to ensure "that [the] package wasn't lost and if [an] individual did come and pick [it] up," then officers could "monitor th[e] individual leaving the area."

On that day, Investigator Vera saw a black man walk out of the hotel with the package containing ketamine that Vera was investigating. Vera and other law enforcement officers stopped the man before he could get into a car and leave. When Vera made contact with the man, the man stopped, put down the package, and followed the instructions given by the officers. The man was arrested, but Vera learned that another person had been arrested as well. The black man who picked up the package with whom Vera interacted was not appellant.

DHS Investigator K. Bradley testified that in December 2022, he was involved in an investigation related to a delivery of a package containing ketamine at a Holiday Inn hotel in Galveston. Bradley was involved with surveillance of the hotel. He parked his car on the right side of the hotel, facing the parking area. While parked, Bradley saw a light-colored car pull into the hotel's parking lot and a black man, whom Bradley later learned was named Dalton Brown, exit the car and walk into the hotel. A second black man, the driver of the car,[5] parked and

---

[5]     Investigator Bradley later learned the last name of the driver, which was "Akinrinlola."

4

exited the car, walking back toward the rear of the hotel between some buildings and out of sight.

Investigator Bradley was then notified that Brown had picked up the package containing the ketamine and exited the hotel. Law enforcement officers stopped him once he exited the hotel with the package. After the "arrest signal" was "called," Bradley moved his car "along the side of the pool area" "to block" Brown, who had picked up the package, "if [he] tried to run." Bradley saw Brown with the package containing ketamine in his hands. Brown was not appellant.

Investigator Bradley further explained that while other law enforcement officers were arresting Brown, he "step[ped] back" to "pay attention to what[] [was] going on around [him]," and he saw the driver of the car "coming from behind th[e] buildings," walking "back towards the direction of the car." Bradley, who could be identified as law enforcement by his armor, went toward the driver and told him, "Hey, police. Come here, come here." The driver had only a water bottle and possibly a cellular telephone in his hands. According to Bradley, after he yelled at the driver, the driver "kind of froze" and then "start[ed] to turn and to look both ways." At that point, Bradley "drew [his] firearm" and told the driver, "Hey, don't move." The driver complied, and Bradley placed him in handcuffs and arrested him. Bradley never saw the driver interact with the package containing ketamine that Brown retrieved from the hotel.

Former Galveston Police Department Detective M. Cauley testified that he was previously a "task force officer" with DHS. As part of that role, Cauley participated in "package review[s]," meaning he reviewed international or interstate package shipments for illicit goods, such as narcotics. In fall 2022, Cauley was assigned a package-review case and was informed that CBP "had intercepted a package of illicit drugs that was supposed to be delivered to a hotel" in Galveston. The package was sent from a narcotics distributor in Belgium, and it contained more than four kilograms of ketamine.[6] According to Cauley, a typical dose of ketamine was less than five milligrams; thus, the amount of ketamine in the package was not "a personal use amount."

Detective Cauley explained that the package was addressed to a Lisa Pimbley, but his investigation revealed that no one by that name existed in the Galveston area. Because there were no leads from the information Cauley obtained from the package itself, he conducted a "controlled delivery" of the package to its intended destination—the hotel in Galveston. According to Cauley, a "controlled delivery" meant that an undercover law enforcement officer delivered the package to its intended destination as either a postal worker or UPS delivery person and then waited to see who picked up the package.

---

[6] Detective Cauley estimated that the value of the ketamine was between $20,000 and $50,000.

6

Detective Cauley further explained that on November 17, 2022, a law enforcement officer, dressed as a postal worker or UPS delivery person, brought the package to the Holiday Inn hotel in Galveston and delivered it to the front desk. At the time, there were other law enforcement officers throughout the hotel and in the parking lot to see if anyone tried to claim the package or pick it up. Ultimately, no one came to retrieve the package that day; thus, law enforcement "took control of the package again" and "advised [the] people at the hotel that if anyone came for the package or contacted them about the package to let [law enforcement] know" so that officers could set up a second delivery. Later, law enforcement officers received a telephone call from the hotel "stating that someone had contacted the hotel in reference to th[e] package," so Cauley set up a second "controlled delivery." According to Cauley, the person who requested the package from the hotel was Brown. Before law enforcement officers conducted a second "controlled delivery," Cauley obtained current photographs of Brown through social media.

As to the second "controlled delivery," Detective Cauley testified that, on December 9, 2022, law enforcement officers took the package containing the ketamine "into the normal discharge area" at the Holiday Inn hotel and monitored it through the hotel's surveillance cameras. Law enforcement officers were also inside the hotel to watch for anyone arriving, and other officers were in the parking lot to monitor cars arriving at the hotel. Cauley was in the parking lot of the hotel.

7

At some point, a silver car with Brown and another occupant—appellant[7]—arrived at the front of the hotel. Cauley was able to identify Brown visually. Brown exited the car and went inside the hotel for a short period of time. While Brown was in the hotel, appellant waited for Brown in the hotel's parking lot.

Inside the hotel, law enforcement officers saw Brown claim the package containing ketamine and retrieve it; he then started to leave the hotel with the package. Brown was stopped and arrested by law enforcement officers upon exiting the hotel. After Brown was arrested, Cauley made contact with appellant, who was also arrested. Cauley noted that appellant never had physical possession of the ketamine package on December 9, 2022, and the package was not placed in the car appellant had been driving because law enforcement officers intercepted the package once Brown exited the hotel. Appellant did not go into the hotel to retrieve the package containing ketamine.

Detective Cauley also testified that as part of the investigation, law enforcement officers obtained two cellular telephones—one belonging to Brown and one belonging to appellant. Search warrants for the cellular telephones were obtained. A search of Brown's cellular telephone showed messages between Brown and appellant on the Signal application. Photographs of Brown's cellular

---

[7]    According to Detective Cauley, appellant, the driver of the car, dropped Brown off at the front entrance of the hotel.

8

telephone showing the messages sent between Brown and appellant were admitted into evidence at trial.

As to those messages, Detective Cauley explained that, on October 27, 2022, appellant sent Brown a message, saying, "[The] pack is landing on Monday"[8] and gave Brown the address for the Holiday Inn hotel in Galveston. Brown responded saying, "Got you. What about the other one? I'll let her know," to which appellant replied, "I'll let you know probably following Monday." Brown then asked appellant, "What's the name in that one again?" and appellant told Brown, "Lisa [P]imbley." Cauley noted that Lisa Pimbley was the name on the package that law enforcement officers had discovered containing ketamine and the one involved in Cauley's investigation.

On November 7, 2022, Brown sent appellant a message asking, "Still scheduled to land today?" and appellant responded, "Not yet probably a couple days." Appellant then sent Brown an address located in South Carolina and asked, "Yo this address confirmed?" Brown responded, "Yes," and appellant told Brown, "[T]his one is going out next week." Based on this portion of the conversation, Detective Cauley determined that the package involved in his investigation was not the only package containing narcotics being delivered in the United States and

---

[8] Detective Cauley stated that "pack" meant "package."

9

Brown and appellant had "been routinely setting up these packages to be delivered at multiple locations."

Next, Brown told appellant, "Ok got you[.] It's still confirmed. Add room 224 on it," and appellant responded, "Do I have to add room 224[?] . . . Or can I have it as is?" Brown stated, "You don't have to, but since it's not going to be in my name fully that's why I suggested it," to which appellant replied, "Ahhhh makes sense." Brown also explained, "[B]ut its [sic] cool I have a bitch that work at the front desk[.] I'll still get it." Appellant asked Brown, "That's your room number?" and stated, "I'd prefer to use something that doesn't go to you lol." Brown replied, "It's 224. I got you but anyone can change room at anytime it's a hotel." Appellant then told Brown, "Ahhh makes sense[.] Yeah I guess I'll just add room number lol[.]"

On November 18, 2022, appellant called Brown and then sent him a message, saying, "It got delivered yesterday[.] Ups."[9] Brown replied, "Ok got you," and called appellant. A few hours later, appellant sent Brown another message, asking "Any update?" and Brown replied, "Not yet." Appellant asked, "What's she waiting on?" and Brown stated, "Her coworker." Detective Cauley was later able to identify "she" and "[h]er" referenced in Brown's and appellant's

---

[9]     Detective Cauley noted that the date of the first "controlled delivery" was November 17, 2022.

messages as Christina Jara, an individual who worked at the Holiday Inn hotel in Galveston.

Appellant next told Brown, "Damn is it busy up there? Lol I'm dying right now lmao[.] What's the word my bro[?]" Appellant called Brown again on November 18, 2022 and then on November 19, 2022. Also, on November 19, 2022, Brown sent appellant a message, stating, "Made contact waiting." Brown sent appellant a screenshot of a conversation that he was having with Jara, which said, "There's nothing here babe[.] I'm locating it[.] From who all worked here," and Brown responded, "Ok cool thanks[.] Let me know as soon as you do[.]"

After reading the conversation between Brown and Jara, appellant said to Brown, "Damn are you serious??? When was the last time she worked?" When Brown told appellant, "[Y]esterday," appellant responded, "But she was off on Thursday? Is someone trying to steal my pack because this is not some small shit[.]" Appellant then sent Brown the tracking information for the package containing ketamine, which included the exact address of the Holiday Inn hotel and the tracking number for the package. Brown sent appellant a screenshot of a conversation he had with Jara about the package, during which he asked her, "[W]ho worked Thursday morning? They say it was delivered around 11 am Thursday." Jara replied to Brown, "I asked her, she off n she said she dunno where they put it," and Brown responded, "[W]ho put it where? Call me please what time

11

you getting off?  So she did receive it right?"  Appellant asked Brown, after seeing the conversation, "Do you trust this bitch ain't lying about the pack?"  And Brown told appellant, "I know she's not lying.  Don't know about the other people she work with[.]  We going to get it figured it [sic] out bro one way or the other."  Appellant told Brown, "I should've sent it to your drop, this was the first pack and if the feds were involved I didn't want you taking any heat," and Brown replied, "I know bro[.]  I got you plus Galveston is closer too[.]  I wish you would've sent it to me too[.]  We would've been on the way back to you now[.]"  In response, appellant stated, "Yeah it's just unfortunate that I wasn't on it as soon as it said delivered, if I lose the pack it's gonna cost me like 30k," and Brown said, "Bro we not going [to] loose [sic] that shit.  Someone got to answer for it since it was delivered."  Appellant then told Brown, "Bro tell this bitch if she can save my pack I got an [sic] band for her lol Extra*,"[10] and Brown said, "Lol you crying man. . . . I got you bro."  Appellant said, "Yes bro anything to get his pack Lmaoo."

After additional telephone calls between appellant and Brown on November 19, 2022, Brown sent appellant a screenshot of another conversation between him and Jara in which Jara told Brown, "They received it but looks like they returned it

---

[10]     Detective Cauley stated that a "band" meant "a thousand dollars or more," and appellant's message to Brown indicated that "[h]e was trying to pay someone to locate the package, and he would throw extra money on top . . . of what they had already given to . . . Jara."

back to sender is what my boss said[.]  He said cuz name was not in the system."

Brown replied, "Damn man when did they do that?" and Jara responded, "The same day is usually when they do it."  When Brown told appellant that he thought the hotel had sent the package back, appellant asked Brown, "Is there a tracking number? . . . Bro if there's no new tracking number then the package wasn't returned."  On November 20, 2022, Brown told appellant, "There's no tracking bro.  He gave it back to the ups guy she said," and appellant responded, "Damn does she know which manager I need to verify that's what happened so I can get a reship from my vendor[.]  I'm gonna have one of my bitches call about the pack."

On November 21, 2022, appellant messaged Brown, stating, "Bro whoever worked that day stole my pack[.]  Ups said they didn't get a returned pack[.]  Idk either your girl is lying or whoever her manager is is lying but someone is."  Brown called appellant later that day.  On November 22, 2022, appellant asked Brown for an update.  Appellant also told Brown, "Bro [I] got 5k for the pack put out the word please[.]  And tell her the full 5k, just to see what she says."  Brown replied, "Ok got you."  On November 23, 2022, appellant messaged Brown saying, "Any feedback?  Ask this bitch [w]ho do I need to call to get some real answers?"  When Brown did not respond that day, on November 24, 2022, appellant messaged, "Yo."  Brown then replied, "Nothing at all.  Bro the next step is to call and ask for the camera that day," and appellant said, "Alright."  On November 25,

13

2022, appellant called Brown and then messaged asking for confirmation of the South Carolina address they had previously spoken about.

On November 29, 2022, Brown sent appellant a screenshot of a voicemail transcription showing a message the Holiday Inn hotel manager left for Brown after Brown had contacted the hotel about the package. Brown told appellant, "Still trying on that package bro. We go [sic] see if we can come up with something," and appellant responded, "Thanks g." Brown and appellant proceeded to have telephone calls on December 7, 2022 and December 8, 2022. On December 9, 2022, Brown messaged appellant saying, "Try to get a ride set up just in case bro," and Brown sent appellant flight information. Appellant and Brown also called each other on December 9, 2022.[11]

Detective Cauley also testified about the results of the search of appellant's cellular telephone. Photographs of messages between appellant and other individuals from the Signal application were admitted into evidence at trial. According to Cauley, the messages revealed that appellant was discussing narcotics with multiple people and was "shipping . . . packages all over the country." For instance, appellant and "Steven NY" discussed either "MDMA or meth" coming in from Europe and "setting up shipment details." In a message sent

---

[11]    Detective Cauley noted that December 9, 2022 was the date of the second "controlled delivery" of the package containing ketamine and the date that Brown and appellant were arrested at the Holiday Inn hotel after Brown picked up the package.

from appellant to Steven NY on March 18, 2022, appellant said, "Packs are ramping back up, you got any available drops in NY?" and Steven NY responded, "Yea you need addys?" Steven NY sent appellant an address in New York and appellant told him, "Cool I'll let you know when I'm ready to dispatch[.] And it'll be M from Europe." After discussing more shipment details, appellant told Steven NY, "It's a smaller pack so it's $500." In a conversation with another person, appellant sent photographs of narcotics. While reviewing the messages during trial, Cauley testified that appellant was selling narcotics to multiple people in large quantities throughout the United States and trying to also do so internationally.

Also, during Detective Cauley's testimony, a copy of the extraction report from appellant's cellular telephone was also admitted into evidence. While viewing the report, Cauley explained that Brown was listed as a "contact" in appellant's cellular telephone, and the "call log" indicated that Brown and appellant had been in contact for at least two years before they were arrested in December 2022. The call log also showed multiple calls between Brown and appellant on December 9, 2022, the date of their arrest.

Further, the extraction report revealed text messages sent between Brown and appellant beginning on September 21, 2022. Appellant then sent Brown a message on October 25, 2022, stating, "My brooo, you know anyone working at a

15

hotel or reception?  I need a drop for a pack $1k for the pack." Brown responded, "You can send it to me[.]  I'll send you the info later am at a hotel and can receive packages there."  Appellant asked Brown, "How long you at the hotel for?" and Brown responded, "The rest of the year.  When you trying to send it?"  Appellant then told Brown, "And I prefer to use a fake name will you still be able to secure it?" to which Brown confirmed, "Yeah I will."  Appellant asked, "For sure for sure???  Like guaranteed for sure?  Lol," and Brown told him, "Yes."  Brown also told appellant, "I might have someone in [H]ouston as well a receptionist.  I'll hit her up later," and appellant replied, "Ok set me up with the addy as soon as poss my bro and yes multiple is ideal thank you."  Related to these messages, Detective Cauley explained that appellant and Brown were discussing "[a] conspiracy to deliver ketamine to the hotel in Galveston and possible more deliveries in other locations."

The extraction report from appellant's cellular telephone also showed multiple conversations between appellant and other individuals about appellant securing and selling ketamine and other narcotics.  In the messages, appellant stated that he had large quantities of ketamine to sell, which were coming from Europe.  Further, appellant asked an individual if he "kn[e]w anyone working at a

16

hotel or reception" because he "need[ed] a drop for a pack $1k for the pack."[12]

The individual responded to appellant, "What? Lmao are you speaking drug dealer to me," and appellant stated, "Lol yes[.]  I need an address preferably if you know anyone working at a front desk.  Hotel, apt. business reception any of the above, it'll be a medium sized box with fake name."  The individual asked appellant, "So it's just a box getting delivered and you'll be picking it up??" and appellant replied, "[Y]eah exactly."  The individual asked, "You couldn't like have it delivered to an apartment or something?  Like my apts have a locker system anything going to my address gets put in a locker and it sends me a notification that I have a package and I get into the locker using a code."  Appellant responded, "That honestly could be an option, all your UPS packs get dropped in a box and not left with a front desk person?" and the individual stated, "Yup.  But I'll have to double check that the package doesn't need to have my name on it.  I don't think it would, but I'll call and check with the office.  My friend said just send it to her house but I'm assuming it's too big of a risk to have it left."[13]

---

[12]    Detective Cauley explained that "$1k for the pack," meant that appellant would pay the person $1,000 "to help facilitate a package being delivered."

[13]    Additional messages between appellant and other individuals were admitted into evidence at trial, including messages about appellant selling individual doses of ketamine and people seeking to buy ketamine from appellant.  We need not detail all the messages extracted from appellant's cellular telephone but have reviewed the complete record.  *See* TEX. R. APP. P. 47.1; *Obernhoff v. Nelson*, No. 01-17-00816-CV, 2019 WL 4065017, at *18 n.19 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, no pet.) (mem. op.).  In total, the trial court admitted more than

17

Detective Cauley testified that after reviewing the messages on appellant's cellular telephone and Brown's cellular telephone, as well as the rest of the evidence, he determined that "there had been a conspiracy between multiple parties to ship a large quantity of ketamine to the Holiday Inn [hotel] in Galveston and get paid for doing so and to distribute that ketamine to other people after they received the package." According to Cauley, appellant, Brown, and Jara were involved in the conspiracy. Cauley believed that appellant had committed the offenses of possession of a controlled substance with intent to deliver and engaging in organized criminal activity. Cauley stated that appellant was the transport person for the ketamine and knew what was in the package that was delivered to the Holiday Inn hotel in Galveston. Further, appellant was the person who gave Brown the name of Lisa Pimbley and the tracking number for the package containing ketamine. Appellant was the person who ordered the package and had it sent to Galveston.

## Motion to Suppress

In his first issue, appellant argues that the trial court erred in denying his motion to suppress the ketamine and his cellular telephone because law enforcement officers did not have probable cause to support appellant's warrantless arrest.

fifty exhibits related to appellant's cellular telephone into evidence at the State's request.

18

We apply a bifurcated standard to review a trial court's denial of a motion to suppress evidence. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion and the trial court's application of the law to the facts de novo. *Id.* At a suppression hearing, the trial court is the sole trier of fact and judge of the witnesses' credibility, and it may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When, as here, a trial court does not make explicit findings of fact, we review the evidence in a light most favorable to the trial court's ruling, and we assume that the trial court made implied findings of fact that support its ruling as long as those findings are supported by the record. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 35–36 (Tex. Crim. App. 2017); *see also Walter v. State*, 28 S.W.3d 538, 540 (Tex. Crim. App. 2000). We give almost total deference to a trial court's implied findings, especially those based on an evaluation of witness credibility or demeanor. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). Nonetheless, we review de novo a trial court's determination of legal questions. *State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Valtierra*, 310 S.W.3d at 447–48.

## A.    Standing

As an initial matter, the State raises a standing issue in its briefing on appeal. Here, appellant, through his motion to suppress, sought to suppress the ketamine and his cellular telephone, both of which were recovered outside the hotel by law enforcement officers. *See State v. Iduarte*, 268 S.W.3d 544, 549–50 (Tex. Crim. App. 2008) (evidence obtained as result of Fourth Amendment violation, such as illegal arrest, must be suppressed under "fruit of the poisonous tree" doctrine (internal quotations omitted)); *Welcome v. State*, 865 S.W.2d 128, 133 (Tex. App.—Dallas 1993, pet. ref'd) ("As a general rule, the fruit of the poisonous tree doctrine forbids the use of evidence [at trial] obtained following an illegal arrest."). The State, in its briefing, argues that appellant lacked standing to challenge the trial court's failure to suppress the ketamine recovered from Brown, the man who picked up the package containing ketamine from the hotel, because Brown was "arrested separately from . . . appellant," "the package of [k]etamine was recovered away from . . . appellant," and Brown was in possession of the package of ketamine, not appellant.[14] *See State v. Millard Mall Servs., Inc.*, 352 S.W.3d 251, 253 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("[T]he State may raise the issue of standing for the first time on appeal in a court of appeals.").

---

[14]    The State does not assert that appellant lacks standing to challenge the trial court's failure to suppress his cellular telephone, which was recovered from appellant's person by law enforcement officers at the time of appellant's arrest.

Appellant does not dispute that the package containing ketamine was recovered by law enforcement officers from Brown after Brown carried the package out of the hotel and was arrested outside the hotel. Appellant also does not assert that he was ever in possession of the ketamine package. Whether appellant has standing to challenge the recovery of the ketamine from Brown is a question of law that we review de novo. *See State v. Johnson*, 896 S.W.2d 277, 285 (Tex. App.—Houston [1st Dist.] 1995), *aff'd*, 939 S.W.2d 586 (Tex. Crim. App. 1996). Appellant has the burden to prove standing to complain about the search or seizure. *State v. Pettit*, 713 S.W.3d 834, 839 (Tex. Crim. App. 2025); *see also Rogers v. State*, No. 02-15-00160-CR, 2016 WL 299752, at *2 (Tex. App.—Fort Worth Jan. 14, 2016, pet. ref'd) (mem. op., not designated for publication) ("The right to challenge the lawfulness of a search is limited to persons with standing—that is, to those who have been aggrieved by a search and seizure.").

A defendant bringing a motion to suppress must establish that he had a reasonable expectation of privacy that the government invaded. *See State v. Mercado*, 972 S.W.2d 75, 78 (Tex. Crim. App. 1998). A person has standing to challenge a search or seizure under a reasonable-expectation-of-privacy theory if: (1) the person has a subjective expectation of privacy in the place or object searched and (2) society is prepared to recognize that expectation as "reasonable"

21

or "legitimate." *Wiltz v. State*, 595 S.W.3d 930, 934 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (internal quotations omitted).

A defendant does not have a reasonable expectation of privacy in the search of a third person. *Hughes v. State*, 24 S.W.3d 833, 838 (Tex. Crim. App. 2000); *Rogers*, 2016 WL 299752, at *2; *see also Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004) (defendant "has no standing to complain about the invasion of someone else's personal rights"). Further, "[b]eing charged with [a] crime does not mean [that a defendant] may automatically challenge the legality of [a] search." *Millard Mall Servs.*, 352 S.W.3d at 253–54; *see also Franklin v. State*, 913 S.W.2d 234, 240 (Tex. App.—Beaumont 1995, pet. ref'd) ("Merely because a person is on the premises or has been charged with crimes of possession does not mean that he may automatically challenge the legality of a search."). Texas Code of Criminal Procedure article 38.23(a)[15] "does not confer third-party standing to persons accused of crimes, such that they may complain about the receipt of evidence that was obtained by violation of the rights of others, no matter how remote an interest from themselves." *Millard Mall Servs.*, 352 S.W.2d at 254.

---

[15] Texas Code of Criminal Procedure article 38.23(a) provides that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." TEX. CODE CRIM. PROC. ANN. art. 38.23(a).

The State asserts that appellant "did not have a reasonable expectation of privacy in the [k]etamine that was recovered from . . . Brown," and the fact that appellant was later charged "with the possession of that [k]etamine" did not change that. We agree.

To determine if appellant had a legitimate expectation of privacy in the ketamine seized from Brown, we must first consider whether appellant has demonstrated an actual subjective expectation of privacy. *See State v. Sepeda*, 349 S.W.3d 713, 716 (Tex. App.—Houston [14th Dist.] 2011, no pet.). There is no evidence in the record that appellant had a subjective expectation of privacy in the ketamine that was in Brown's possession, nor does appellant claim one in his brief. *See id.*; *State v. Simon Prop. Grp., Inc.*, 357 S.W.3d 687, 691 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("The record reflects the evidence suppressed by the trial court was secured by a search of a third person's premises or property."); *see also Hollis v. State*, 219 S.W.3d 446, 457–58 (Tex. App.—Austin 2007, no pet.) ("An accused lacks standing to challenge the admission of evidence obtained by searching an area in which he or she does not have a legitimate expectation of privacy.").

Instead, to get around the State's argument that he had no "reasonable expectation of privacy in the [k]etamine that was recovered from . . . Brown," appellant relies on the Texas Court of Criminal Appeals's decision in *Kothe* and

23

asserts that "the standing issue regarding the seizure of the [k]etamine [was] 'transcended' by [appellant's] unlawful arrest." Appellant's reliance on *Kothe* is misplaced.

In *Kothe*, the car of Kothe, the defendant, was stopped by a law enforcement officer who suspected that Kothe, the driver, was intoxicated. 152 S.W.3d at 57–58. The law enforcement officer conducted a field sobriety test of Kothe and quickly satisfied himself that Kothe was not intoxicated. *Id.* at 58. However, the officer continued to detain him and ultimately found narcotics paraphernalia in the car and heroin on the person of Kothe's passenger, Brantley. *Id.* Kothe was arrested for possession of heroin and narcotics paraphernalia. *Id.*

Kothe moved to suppress the heroin found on Brantley's person, asserting that his continued detention after the officer determined that he was not intoxicated was constitutionally unreasonable and illegal. *Id.* The trial court granted Kothe's motion to suppress, and the State appealed, asserting that Kothe did not have standing to challenge the search of Brantley—a third person. *Id.* at 58–59. On appeal, the court of appeals agreed with the State that Kothe would normally lack standing to complain about the search of Brantley, but ultimately concluded that because of Kothe's prolonged detention, all the evidence seized because of the illegal detention was tainted. *Id.*

On appeal to the Texas Court of Criminal Appeals, the court held that while Kothe did not have a reasonable expectation of privacy in the heroin secreted in Brantley's clothing, he did have standing to challenge his own illegal prolonged detention and any fruits from that detention, which under the facts of that case included the heroin obtained from the search of Brantley. *Id.* at 60–62.

We find *Kothe* distinguishable from the present case. Notably, in *Kothe*, Kothe's Fourth Amendment complaint was based upon a purportedly prolonged unlawful detention of himself and the heroin that was ultimately discovered was because of Kothe's illegal detention. The same cannot be said of the ketamine in Brown's possession. *See Guerrero v. State*, No. 04-04-00684-CR, 2005 WL 2438315, at *2–4 (Tex. App.—San Antonio Oct. 5, 2005, no pet.) (mem. op., not designated for publication) (finding *Kothe* inapplicable); *cf. State v. Story*, No. 04-12-00235-CR, 2013 WL 1640781, at *5 (Tex. App.—San Antonio Apr. 17, 2013) (mem. op., not designated for publication) (finding *Kothe* applicable because "all of the evidence seized by [law enforcement officers] . . . was tainted because it was obtained *during* [defendant's] unlawful arrest" (emphasis added)), *aff'd*, 445 S.W.3d 729 (Tex. Crim. App. 2014); *Metoyer v. State*, No. 13-09-00594-CR, 2011 WL 2176232, at *4 (Tex. App.—Corpus Christi–Edinburg June 2, 2011, no pet.) (mem. op., not designated for publication) ("[T]he fact that [defendant] is challenging the detention that occurred prior to the search is enough to transcend

any question of his expectation of privacy in the vehicle because [defendant] alleges that it was the improper detention that led to the discovery of the evidence that he now seeks to suppress."). Thus, we conclude that *Kothe* is inapplicable to the instant case.

Because appellant is unable to demonstrate a legitimate expectation of privacy in the ketamine seized from Brown, we hold that he lacks standing to challenge the trial court's failure to suppress the ketamine recovered from Brown. As such, in regard to appellant's first issue, we will only address appellant's complaint that the trial court erred in denying his motion to suppress his cellular telephone because law enforcement officers lacked probable cause to arrest appellant.

## B. Probable Cause for Warrantless Arrest

In his first issue, appellant argues that law enforcement officers lacked probable cause to arrest him without a warrant on December 9, 2022 because officers only knew that "[l]aw enforcement [had] intercepted a package containing 4.8 kilograms of ketamine destined to be delivered to Lisa Pimbley at a Holiday Inn [hotel]," Brown, not appellant, had "called the [hotel] to tell them that 'his' package containing the ketamine had been sent to the wrong hotel and that he would be picking it up," and Brown, not appellant, "entered the hotel, picked up the package, and brought it back to the car that [a]ppellant was driving." Further,

appellant asserts that law enforcement officers had "no information that [a]ppellant ever saw the package let alone knew what was inside of it."

The Fourth Amendment protects against unreasonable searches and seizures. U.S. CONST. amend. IV; *State v. Villarreal*, 475 S.W.3d 784, 795 (Tex. Crim. App. 2015). A warrantless arrest is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. *State v. Sanchez*, 538 S.W.3d 545, 549 n.27 (Tex. Crim. App. 2017). In Texas, law enforcement officers may arrest an individual without a warrant only if probable cause exists as to that individual, and the arrest falls within one of the exceptions set out in the Texas Code of Criminal Procedure. *State v. Martinez*, 569 S.W.3d 621, 628 (Tex. Crim. App. 2019); *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005); *see* TEX. CODE CRIM. PROC. ANN. arts. 14.01–.04.

Appellant only disputes that law enforcement officers lacked probable cause to arrest him outside the Holiday Inn hotel on December 9, 2022, so our focus will be on the probable cause requirement. *See, e.g.*, *State v. Cha*, No. 05-24-00835-CR, 2025 WL 2324092, at *3 (Tex. App.—Dallas Aug. 12, 2025, no pet.) (mem. op., not designated for publication).

"The burden is on the State to prove the existence of probable cause to justify a warrantless arrest . . . ." *Amores v. State*, 816 S.W.2d 407, 413 (Tex. Crim. App. 1991); *Randolph v. State*, 152 S.W.3d 764, 770 (Tex. App.—Dallas

27

2004, no pet.). Probable cause exists, under the totality of the circumstances, if, when the arrest is made, the facts, circumstances, and reasonably trustworthy information known to the arresting officer are sufficient for a prudent person to conclude that an individual committed or was committing a criminal offense. *State v. McGuire*, 689 S.W.3d 596, 602 (Tex. Crim. App. 2024); *Martinez*, 569 S.W.3d at 628.

Probable cause "is not reducible to precise definition or quantification." *Florida v. Harris*, 568 U.S. 237, 243 (2013). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable cause] decision." *Illinois v. Gates*, 462 U.S. 213, 235 (1983). Instead, probable cause is a commonsense, nontechnical concept that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996). A mere suspicion or hunch is insufficient to support probable cause. *Torres*, 182 S.W.3d at 902. Specific and articulable facts are required. *See State v. Woodard*, 341 S.W.3d 404, 411–12 (Tex. Crim. App. 2011). Nonetheless, "[p]robable cause deals with probabilities; it requires more than mere suspicion, but far less evidence than that needed to support a conviction or even that needed to support a finding by a preponderance of the evidence." *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997). In determining whether the State has met

its burden, we consider the totality of the circumstances. *See Adkins v. State*, 764 S.W.2d 782, 785 (Tex. Crim. App. 1988).

Notably, a law enforcement officer must have probable cause with respect to the person being arrested. *Parker v. State*, 206 S.W.3d 593, 596–97 (Tex. Crim. App. 2006); *see also Torres*, 182 S.W.3d at 901 ("A police officer may arrest an individual without a warrant only if probable cause exists with respect to the individual in question . . . ."). Thus, the "evidence must show that at [the] moment [of the arrest] the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrested person had committed or was committing an offense." *Parker*, 206 S.W.3d at 596 (second alteration in original) (internal quotations omitted). As the Texas Court of Criminal Appeals has explained: "There is . . . a significant difference between the notion that there is probable cause to believe that *someone* has committed an offense and probable cause to believe that th[e] particular person [being arrested] has committed an offense." *Id.* at 596–97.

Here, at the time that Investigator Bradley arrested appellant, he was aware that law enforcement was investigating the delivery of a package containing ketamine at a Holiday Inn hotel in Galveston. *See Atkins v. State*, 919 S.W.2d 770, 774 (Tex. App.—Houston [14th Dist.] 1996, no pet.) ("In reviewing a warrantless

arrest to determine the existence of probable cause, [the court] look[s] to the facts known to the officer at the time of the arrest. Subsequently discovered facts or later-acquired knowledge, like the fruits of a search, cannot retrospectively serve to bolster probable cause at the time of the arrest." (internal citations omitted)).

On the day of appellant's arrest, Bradley knew that he was surveilling the hotel where the ketamine package had been delivered, and he parked his car on the right side of the hotel, facing the parking area. While there, he saw a light-colored car pull into the parking lot of the hotel, and a black man exit the car and walk into the hotel. Bradley then saw the driver of the car park the car in the parking lot and exit. The driver walked toward the rear of the hotel between some buildings and out of sight.

Investigator Bradley was then notified by other law enforcement officers that the man who had gone into the hotel had picked up the package containing the ketamine and had exited the hotel. After the "arrest signal" was "called," Bradley moved his car "along the side of the pool area" "to block" the person who had picked up the package, "if [he] tried to run." Bradley saw the man with the package in his hands. That man was not appellant.

While the man was being arrested, Investigator Bradley "step[ped] back" to "pay attention to what[] [was] going on around [him]," and he saw the driver of the car "coming from behind th[e] buildings," walking "back towards the direction of

30

the car." Bradley then walked toward the driver, saying, "Hey, police. Come here, come here." The driver had only a water bottle and possibly a cellular telephone in his hands. According to Bradley, after he yelled at the driver, the driver "kind of froze" and "start[ed] to turn and to look both ways." *See Glass v. State*, 681 S.W.2d 599, 602 (Tex. Crim. App. 1984) ("[W]hen a citizen is suddenly facing an imminent confrontation with police officers for unknown reasons, most citizens with nothing to hide will nevertheless manifest an understandable nervousness in the presence of the officer. . . . Thus, the appearance of being nervous is as consistent with a person being guilty of having committed or preparing to commit a criminal wrong as with a person not being guilty of anything more than being in the wrong place at the wrong time."); *Muñera v. State*, 965 S.W.2d 523, 531 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) ("The Court of Criminal Appeals has held that furtive eye movements furnish no basis for suspicion of criminal activity. Moreover, [i]t is not beyond the norm for an innocent person to appear nervous if detained and questioned by police officers. Nervousness when confronted by an officer can support either innocence or guilt because many people react nervously when they are approached by police." (alteration in original) (internal citations and quotations omitted)); *see also Turner v. State*, No. 05-10-01225-CR, 2011 WL 4953438, at *4 (Tex. App.—Dallas Oct. 18, 2011, no pet.) (mem. op., not designated for publication) (in holding law enforcement officer did not have

31

reasonable suspicion to stop defendant, noting that officer provided no evidence that defendant "was in fact fleeing from the scene"). At that point, Bradley "drew [his] firearm" and told the driver not to move. The driver complied, and Bradley arrested him.

The Texas Court of Criminal Appeals has repeatedly held that furtive gestures alone are not a sufficient basis for probable cause. *Marcopoulos v. State*, 538 S.W.3d 596, 600 (Tex. Crim. App. 2017). Instead, "furtive gestures must be coupled with reliable information or other suspicious circumstances relating the suspect to the evidence of [the] crime to establish probable cause." *Id.* at 602 (internal quotations omitted). A suspect's furtive gestures must directly, rather than vaguely, connect the suspect to criminal activity. *Id.* at 603.

Here, we cannot say that appellant's actions, i.e., dropping someone off at the hotel, parking his car and walking to the rear of the hotel, returning to the car holding a water bottle, "kind of" freezing when a law enforcement officer yelled to him, and "starting to turn and look both ways" when approached and yelled at by an officer, assuming they could even be considered furtive gestures, rise to the level of establishing probable cause. *Id.*; *see also Torres v. State*, 868 S.W.2d 798, 800–03 (Tex. Crim. App. 1993) (holding no probable cause to arrest defendant, where before defendant was arrested, only facts known to officers about defendant were that he drove person to third-party's house and he waited in car); *cf. Furtive*

32

*Gesture*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "furtive gesture" as "[a] surreptitious movement, esp[ecially] one seeming to hide something, seen by a police officer and providing reasonable suspicious to detain or search").

Further, we note that Investigator Bradley did not observe anything at the scene related to appellant which could objectively be considered criminal conduct. *See Amores*, 816 S.W.2d at 416; *see also Oaks v. State*, 642 S.W.2d 174, 177 (Tex. Crim. App. 1982) (mere presence of defendant at scene does not make one party to offense). "An arresting officer must have specific knowledge to believe that the person to be arrested has committed the offense." *State v. Steelman*, 93 S.W.3d 102, 108 (Tex. Crim. App. 2002). Based on the facts known to Investigator Bradley at the time of appellant's arrest, he had no independent knowledge of any criminal activity in which appellant had engaged or was about to engage. *See Torres*, 868 S.W.2d at 802–03 ("Where the independent actions of a suspect are as consistent with innocent activity as with criminal activity, such activity does not provide a sufficient basis to justify an arrest.").

We conclude that the totality of the circumstances surrounding appellant's arrest does not support the trial court's implied finding that law enforcement officers had probable cause to arrest appellant without a warrant. Thus, we hold that the trial court erred in denying appellant's motion to suppress his cellular

telephone.[16]  *See Iduarte*, 268 S.W.3d at 549–50 (evidence obtained as result of Fourth Amendment violation, such as illegal arrest, must be suppressed under "fruit of the poisonous tree" doctrine (internal quotations omitted)); *Welcome*, 865 S.W.2d at 133 ("As a general rule, the fruit of the poisonous tree doctrine forbids the use of evidence [at trial] obtained following an illegal arrest.").

## C.    Harm

Appellant argues that he was harmed by the trial court's erroneous denial of his motion to suppress his cellular telephone because the information obtained from appellant's cellular telephone was "the heart and soul of the State's case" at trial and it "served as the tipping point for the jury's guilty verdict."[17]  (Internal quotations omitted.)

We review the harm resulting from a trial court's erroneous denial of a motion to suppress evidence obtained in violation of the Fourth Amendment under the constitutional harmless-error standard of Texas Rule of Appellate Procedure 44.2(a).  *Hernandez v. State*, 60 S.W.3d 106, 106 (Tex. Crim. App. 2001) ("The

---

[16]    Due to our holding, we need not address appellant's second issue in which he argues that the trial court erred in denying his motion to suppress the text messages recovered from his cellular telephone because the affidavit in support of the search warrant for appellant's telephone was deficient.  *See* TEX. R. APP. P. 47.1.

[17]    Although the State does not address harm in its briefing, the Texas Court of Criminal Appeals has determined that the courts of appeals have an independent duty to determine harmlessness, regardless of whether the State briefs it.  *See Smith v. State*, 726 S.W.3d 466, 474–76 (Tex. Crim. App. 2025).

Supreme Court has concluded that the Fourth Amendment requires exclusion of evidence obtained in violation thereof and has held that requirement applicable to the States by the Fourteenth Amendment. Therefore, we hold that the proper harm analysis [when evidence has been admitted in violation of the Fourth Amendment] is the constitutional one of [Texas] Rule of Appellate Procedure 44.2(a)."); *Lopez v. State*, 615 S.W.3d 238, 265 (Tex. App.—El Paso 2020, pet. ref'd). Under this standard, an appellate court must reverse a judgment of conviction or punishment unless it determines beyond a reasonable doubt that the error did not contribute to the defendant's conviction or punishment. TEX. R. APP. P. 44.2(a).

In applying the "harmless error" test, we ask whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (internal quotations omitted). Our analysis does not focus on the propriety of the trial's outcome; instead, we calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We consider such things as the nature of the error, the extent to which it was emphasized by the State, its probable collateral implications, and the weight the jury would probably place on the error. *See Snowden v. State*, 353 S.W.3d 815, 821–22 (Tex. Crim. App. 2011). This, however, is not an exclusive list of considerations. *Id.* at 822. Instead, we take into account any and every

circumstance apparent in the record that logically informs a determination whether, beyond a reasonable doubt, this particular error contributed to the conviction or punishment. *Id.* This requires the court to evaluate the entire record in a neutral manner and not "in the light most favorable to the prosecution." *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989) (internal quotations omitted). A determination of harmless error is, at its heart, a conclusion that the trial court's error could not have affected the jury. *Snowden*, 353 S.W.3d at 819.

Here, the State offered into evidence, and the trial court admitted into evidence, a significant amount of evidence from appellant's cellular telephone, which the State obtained in violation of appellant's Fourth Amendment rights. As evidence of appellant's guilt, the State offered into evidence "the full phone [data] dump and [a] manual extraction from [appellant's] phone." Additionally, the State offered into evidence a report of the extraction from appellant's cellular telephone, numerous screenshots from appellant's cellular telephone, and countless messages from appellant's cellular telephone.[18] The State, in its opening statement and closing argument to the jury, emphasized the evidence it had obtained from appellant's cellular telephone and how it pointed to appellant's guilt of the offenses with which he was charged. *See, e.g.*, *Love v. State*, 543 S.W.3d 835, 857–58 (Tex. Crim. App. 2016) (holding court could not "determine beyond a reasonable

---

[18] At trial, the court admitted more than fifty exhibits related to appellant's cellular telephone into evidence at the State's request.

36

doubt that the [erroneously admitted] text messages [from defendant's cellular telephone] did not contribute to the jury's verdict at the guilt phase" where State, in its closing arguments, "stressed the importance of [defendant's] text messages to prove his guilt"); *Glover v. State*, 695 S.W.3d 829, 837–38 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (where trial court erroneously denied defendant's motion to suppress evidence obtained from his cellular telephone, concluding error not harmless "given the significance of the text messages in evidence," i.e., nineteen pages of incriminating text messages, and State's emphasis of such evidence during its closing argument); *see also Scott v. State*, 227 S.W.3d 670, 694 (Tex. Crim. App. 2007) ("Especially in view of the [State's] final arguments, we cannot say beyond a reasonable doubt that [the erroneously admitted evidence] did not contribute to the jury's verdict.").

Based on the foregoing, we cannot conclude beyond a reasonable doubt that the trial court's error in denying appellant's motion to suppress his cellular telephone did not contribute to his conviction or punishment. As such, we hold that the trial court's error in denying appellant's motion to suppress his cellular telephone was not harmless.

We sustain a portion of appellant's first issue.[19]

---

[19] In his third issue, appellant argues that the trial court erred in denying his motion for new trial because his trial counsel did not provide him with effective assistance during the guilt phase of trial. If it is determined that a defendant has received

**Conclusion**

We reverse the judgments of the trial court and remand the causes to the trial court for a new trial. We dismiss any pending motions as moot.

Kristin Guiney
Justice

Panel consists of Justices Guerra, Guiney, and Johnson.

Publish. TEX. R. APP. P. 47.2(b).

---

ineffective assistance of counsel during the guilt phase of trial, the defendant's conviction must be reversed and the case remanded for a new trial. *See Hagens v. State*, 979 S.W.2d 788, 792 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd). Similarly, if an appellate court determines that the trial court erred in denying a defendant's motion to suppress because the defendant's Fourth Amendment rights were violated, the appropriate remedy is reversal of the conviction and remand for a new trial. *See Schmidt v. State*, 659 S.W.2d 420, 421–22 (Tex. Crim. App. 1983) (rejecting appellant's request to enter a judgment of acquittal based on the trial court's error in admitting unlawfully seized evidence, recognizing that "[t]he admission of the unlawfully seized evidence was trial error, and the proper remedy is to reverse the conviction and remand the cause for a new trial" (internal quotations omitted)); *see, e.g.*, *Fitzgerald v. State*, No. 04-13-00662-CR, 2014 WL 3747270, at \*3 (Tex. App.—San Antonio July 30, 2014, pet. ref'd) (mem. op., not designated for publication). Because review of appellant's third issue would not result in greater relief than he is already entitled to due to our disposition of his first issue, we need not address appellant's third issue. *See Farias v. State*, 426 S.W.3d 198, 201 (Tex. App.—Houston [1st Dist.] Nov. 1, 2012, pet. ref'd) ("[B]ecause review of appellant's [additional] issues would not result in greater relief than the current disposition of the appeal, we do not need to reach them."); *see also* TEX. R. APP. P. 47.1.